IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| LUCY CLARK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.  ) | CASE NO. 2:12-CV-836-WKW |
| ) | [WO] |
| JACKSON HOSPITAL & CLINIC, INC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Lucy Clark worked as a nurse at Defendant Jackson Hospital &Clinic, Inc., from May 2009 to September 2011. After confessing to stealing drugs from the Hospital's inventory and self-administering them on-site while on duty, she took leave in 2011 to receive intensive drug treatment. Plaintiff claims that the Hospital violated her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–54, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–213, when it did not reinstate her employment when she returned from treatment. The Hospital moved for summary judgment (Doc. # 16), and the motion is fully briefed (Docs. # 17, 18, 20, 21, 22). After careful consideration of the arguments of counsel and the relevant law, the court finds that the motion is due to be granted in part and denied in part.

## I. JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue.

## II. STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This responsibility includes identifying portions of the record illustrating the absence of a genuine dispute of material fact. *Id.* If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish – with evidence beyond the pleadings – that a genuine dispute material to each of its claims for relief exists. *Id.* at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable factfinder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

### III.  BACKGROUND

Nurses are licensed by the Alabama Board of Nursing ("ABN"), an organization governed by the Alabama Nurse Practice Act ("ANPA").  Ala. Code § 34-21-1–93; Ala. Admin. Code r. 610-X-1–13.  The ANPA provides that the ABN may "deny, revoke, or suspend" the license of a nurse who "[i]s unfit or incompetent due to the use of alcohol, or is addicted to the use of habit-forming drugs to such an extent as to render . . . her unsafe or unreliable" as a nurse or who "[i]s unable to practice nursing with reasonable skill and safety to patients" because of substance abuse.  Ala. Code § 34-21-25(b)(1).

Nurses suffering the effects of substance abuse may take advantage of the Voluntary Disciplinary Alternative Program ("VDAP"), which offers an alternative to traditional discipline.  Ala. Code § 34-21-25(j); Ala. Admin. Code r.610-X-13.01–.07. The program requires participation in approved treatment and can include limits on licenses to practice, including prohibiting access to controlled substances while on the job.  This limitation is known as a "key restriction."

The Hospital insists it has a standard policy when a nursing employee admits to diverting narcotics from Hospital inventories for the employee's own use, but the policy is unwritten. (*See* Doc. # 18 at 6–8, 29 (describing the unwritten post-diversion policy).)  Though the Hospital's disciplinary action guidelines authorize termination

3

for such conduct, when diversion comes to light – regardless of whether the nurse ever seeks treatment or takes leave – the Hospital's (unwritten) policy prohibits that nurse from returning to a high-acuity units, where patients are seriously or critically ill and where the administration of controlled substances is frequent. It is the Hospital's judgment that assigning recovering nurses to such units puts patients and the Hospital at risk. Moreover, it puts the recovering nurse at risk of relapse, because of the stress inherent in practicing in such units, the wide availability of the drugs, and the nurse's knowledge about supervisors and colleagues that may enhance his or her ability to conceal diversion.

Plaintiff has a history of substance abuse. In February 2009, she lost her job at an oncology clinic after she confessed to the unauthorized diversion and self-administration of intravenous Benadryl from the clinic's inventory. (Doc. # 16 at 12.) She immediately self-reported to the ABN and entered the VDAP, through which she received two weeks of inpatient treatment followed by intensive outpatient treatment for another eight to nine weeks. (Doc. # 16 at 15.) Through VDAP, ABN placed restrictions on Plaintiff's license as a condition of her keeping it, the most notable of which prohibited her from accessing or dispensing controlled substances. (Doc. # 16 at 24.)

Shortly thereafter, in May 2009, Plaintiff went to work at Jackson Hospital. Plaintiff initially practiced in the admission unit, a low-acuity unit where the need to dispense controlled substances was less frequent. (Doc. # 16 at 30.) After about a year there, she went to a progressive care unit ("PCU"), a high-acuity unit. (Doc. # 16 at 36.) Around the same time, Plaintiff requested that the ABN lift the license restriction that prohibited her from dispensing controlled substances; it denied her request. (Doc. # 16 at 38–39.)

In early 2011, Plaintiff began diverting a narcotic painkiller, Dilaudid, from Hospital inventory and self-administering the controlled substance on-site and while on duty. (Doc. # 16 at 43.) Though Plaintiff was still practicing under the key restriction that prohibited her from accessing controlled substances, she would pull Dilaudid for a patient when prescribed, in violation of the key restriction, administer the prescribed dose to the patient, and rather than disposing of excess in accordance with mandatory waste procedures, she would self-administer it. (Doc. # 16 at 43.) Plaintiff's on-site and on-duty diversion and self-administration continued for three to four months. (Doc. # 16 at 44.) In April 2011, Hospital administrators confronted Plaintiff, and she confessed. (Doc. # 16 at 45.) She immediately reported her diversion and use of the drug to the ABN. (Doc. # 16 at 48.)

Plaintiff then reentered intensive treatment for substance abuse. She received twelve weeks of intensive outpatient treatment. (Doc. # 16 at 51.) To seek treatment, and having not been terminated by the hospital, she took leave under the FMLA beginning May 9, 2011, and ending July 31, 2011. (Doc. # 16 at 49, Doc. # 18 at 57.) After her FMLA leave expired, the Hospital placed Plaintiff on a general leave of absence for thirty days.

In accordance with Hospital policy, Plaintiff could not return to work after her FMLA leave expired until a healthcare provider completed a "Fitness for Duty Medical Certification." (Doc. # 18 at 46, 57.) The Hospital provided notice of this policy to Plaintiff in its letter approving her FMLA leave. (Doc. # 18 at 57.) Plaintiff never provided a certification.

Meanwhile, consistent with its post-diversion policy, the Hospital also refused to allow Plaintiff to return to the PCU, though the Hospital insists that it would have allowed her to return to an equivalent position in a non-high acuity unit.[1] During her thirty days of general leave, Hospital administrators also told Plaintiff that her job in the PCU had been filled and that she could not return to the PCU for that reason; in reality, it had not been. (Doc. # 21-3, Doc. # 17 at 18.) Plaintiff was not qualified for

---

[1] The parties have not made clear what effect, if any, submitting a certification would have had on Plaintiff's ability to return to the PCU or any other high-acuity unit.

6

available positions in other units (Doc. # 17 at 47), and at the end of her general leave, the Hospital terminated her employment, explaining there were no positions available in which to place her. (Doc. # 21-4.)

Weeks later, when Plaintiff applied for unemployment benefits with the Alabama Department of Industrial Relations ("DIR"), the Hospital justified Plaintiff's termination by reference to restrictions imposed by the ABN. (Doc. # 21-6.) When the DIR awarded Plaintiff benefits, the Hospital appealed that decision, explaining that it terminated Plaintiff "due to license restrictions." (Doc. # 21-7.) After the DIR Hearing and Appeals Division denied its first appeal, the Hospital appealed again, this time explaining that it terminated Plaintiff because she violated the Hospital's drug and alcohol policy. (Doc. # 21-9.) There was no mention of the post-diversion policy or of Plaintiff's failure to provide a Fitness for Duty Medical Certification.

Months later, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), claiming her termination amounted to discrimination against her on the basis of disability. (Doc. # 1-1.) In response, the Hospital again pointed to Plaintiff's VDAP-imposed license restrictions, which it asserted "left her unqualified to continue working in any nursing capacity where controlled substances would be handled or dispensed," and to the unavailability of positions in other units. (Doc. # 21-10 at 4.) And when responding to Plaintiff's

interrogatories in this litigation, the Hospital offered a similar explanation, pointing to the requirements of work on the PCU, the key restriction imposed by the ABN, and the lack of other available positions.  (Doc. # 21-11 ¶ 12.)

## IV.  DISCUSSION

Plaintiff's complaint consists of three counts, alleging FMLA interference and retaliation claims and an ADA claim.  For the reasons that follow, summary judgment is due on the FMLA interference claim, while the other two claims survive.

### A.   FMLA Claims

The FMLA entitles eligible employees to "12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  Following the leave, employers must restore the employee to the position "held by the employee when the leave commenced" or to "an equivalent position."  29 U.S.C. § 2614(a)(1).  There are two species of FMLA claims – interference and retaliation.

#### 1.   Interference

"To establish an interference claim, 'an employee need only demonstrate by a preponderance of the evidence that [she] was entitled to the benefit denied.'" *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235 (11th Cir. 2010) (quoting *Strickland v.*

*Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206–07 (11th Cir. 2001)). The employee "does not have to allege that [her] employer intended to deny the right; the employer's motives are irrelevant." *Strickland*, 239 F.3d at 1208. Plaintiff does not contend that the Hospital denied or interfered with her right to take leave, only that FMLA entitled her to return to a job in the PCU or an equivalent position, and the Hospital interfered with Plaintiff's rights when it refused to allow her to do that.

Plaintiff's contentions fail, however, because she did not satisfy a condition of her entitlement to restoration. The FMLA permits employers to require each returning employee to obtain certification from his or her healthcare provider showing that the employee is able to resume work and to provide that certificate to the employer. 29 U.S.C. § 2614(a)(4); 29 C.F.R. §§ 825.312, 825.313(d). Where an employer uniformly imposes such a requirement, it is "a condition of restoration" following leave. 29 U.S.C. § 2614(a)(4). So long as the employer provides a conforming notice of such policy when it approves the employee's leave, if the employee fails to provide a certification upon conclusion of the leave, she may be terminated. 29 C.F.R. § 825.313(d). The Hospital had such a policy, (Doc. # 18 at 46), and provided conforming notice to Plaintiff (Doc. # 18 at 57). Plaintiff has offered no proof that the Hospital did not apply its written policy to all employees returning from FMLA leave, and it is undisputed that Plaintiff did not produce a conforming certification. Without

9

the certification, Plaintiff was not entitled restoration and therefore her interference claim fails.[2] The Hospital could not interfere with a right Plaintiff did not have.

### 2. **Retaliation**

The court's finding that Plaintiff was not entitled to reinstatement under the FMLA because she did not submit a Fitness for Duty Medical Certification is not equivalent to a finding that the Hospital acted on that basis in failing to reinstate and ultimately terminating her. In fact, Gilbert Darrington, the Hospital's Human Resources Director, expressly disclaimed that justification for the Hospital's decision not to reinstate Plaintiff. (Doc. # 17 at 17–18.) Accordingly, the court moves on to Plaintiff's other claims.

"[T]o succeed on a retaliation claim, an employee must demonstrate that [her] employer intentionally discriminated against [her] in the form of an adverse employment action for having exercised an FMLA right." *Strickland*, 239 F.3d at 1207. Unlike an interference claim, a retaliation claim requires proof of an impermissible retaliatory animus. *Id.* And unlike its position on Plaintiff's interference claim, the Hospital does not dispute that Plaintiff was entitled to

---

[2] Plaintiff has offered evidence that her failure to provide the certification was *not* why the Hospital refused to reinstate her. (Doc. # 17 at 17, Docs. # 21-3, 21-4.) Whether the Hospital declined to reinstate Plaintiff because she did not submit a certification or because it aimed to interfere with her FMLA rights or for some other reason is immaterial. Motive is irrelevant in an interference claim. *Strickland*, 239 F.3d at 1208.

10

protection of her right to FMLA leave. The Hospital does dispute that it refused to reinstate and ultimately terminated Plaintiff because she took leave.

In the absence of direct evidence of retaliation, the *McDonnell Douglas* burden-shifting framework developed by the Supreme Court for Title VII cases also applies to FMLA retaliation claims. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Once a plaintiff states a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. *Hurlbert*, 439 F.3d at 1297. If the defendant meets its burden of production, the plaintiff must then show that defendant's reason is pretextual. *Id.*

Plaintiff states a prima facie case of retaliation by demonstrating that (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) the adverse employment action was causally related to her protected activity. *Id.* Elements (1) and (2) are not in dispute. Plaintiff engaged in protected conduct by taking FMLA leave, and her termination is an adverse employment action. This leaves only the third element.

To establish a causal connection, a plaintiff must only demonstrate that the protected activity and adverse action are not "wholly unrelated."[3] *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1278 (11th Cir. 2008) (internal quotations omitted). "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). Thus, the Hospital's refusal to return Plaintiff to the PCU immediately upon her return from leave and her termination a month later – regardless of the Hospital's motives – suffice to establish the causal connection for the purposes of Plaintiff's prima facie case.

Plaintiff having established a prima facie case, the burden of production now shifts to the Hospital to articulate a legitimate reason for its adverse action. The Hospital points to Plaintiff's failure to submit a Fitness for Duty Medical Certification and to its post-diversion policy. These non-retaliatory reasons satisfy the Hospital's burden; thus, Plaintiff must show pretext. "[A]n employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext." *Hurlbert*, 439 F.3d at 1298. As Plaintiff correctly points out, the Hospital's changing justifications for Plaintiff's termination and its failure to articulate these

---

[3] Neither party argues that *Univ. of Texas Sw. Med. Cntr. v. Nassar*, __ U.S. ___, 133 S. Ct. 2517 (2013), altered the causation standard in FMLA claims, and accordingly, the court assumes for the purposes of its analysis of this motion that in a post-*Nassar* landscape, temporal proximity can suffice to establish causation in an FMLA claim.

justifications to Plaintiff herself, undermine the Hospital's explanations and suggest they are pretextual. The Hospital did not offer either of these explanations in its termination letter to Plaintiff or its dealings with the DIR or the EEOC. In fact, a Hospital administrator denied in deposition testimony that the Hospital declined to reinstate Plaintiff because of her failure to submit a certification. (Doc. # 17 at 17.)

Accordingly, Plaintiff has presented evidence – in the form of her termination letter, information submitted by the Hospital to the DIR and EEOC, interrogatory responses, and deposition testimony – from which a reasonable jury could conclude that the Hospital's explanation is pretextual. The court must leave for the jury whether the reasons are actually pretextual.

B.  **ADA Claim**

The ADA prohibits an employer from discriminating against "a qualified individual on the basis of disability" in the "terms, conditions, [or] privileges of employment." 42 U.S.C. § 12112(a). Discrimination may include termination, other adverse employment actions, or the failure to make reasonable accommodations. *Id.* at § 12112(b). The same *McDonnell Douglas* analysis that applies in the FMLA retaliation context applies to an ADA claim. *Raytheon v. Co. v. Hernandez*, 540 U.S. 44, 50 (2003).

To establish a prima facie case, a plaintiff alleging a violation of her rights under the ADA must show that she is a qualified individual with a disability and that her employer discriminated against her because of that disability. *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007). "[A] physical or mental impairment that substantially limits one or more major life activities" is a disability. 42 U.S.C. § 12102(1)(A); *see also* 29 C.F.R. § 1630.2(g) (defining "disability" and implementing equal employment provisions of the ADA). A "qualified individual" is an individual "who, with or without reasonable accommodation, can perform the essential functions" of the job. 42 U.S.C. § 12111(8).

### 1. "Currently Engaging" and § 12114(a)

Attacking Plaintiff's prima facie case, the Hospital first argues Plaintiff cannot prevail on her ADA claim because at the relevant time, she was currently engaging in illegal use of drugs.[4] The ADA expressly excludes "any employee or applicant who is currently engaging in the illegal use of drugs" from its definition of qualified individuals, when the employer "acts on the basis of such use." *Id.* at § 12114(a). But the ADA also qualifies the exclusion by providing that those who have ceased using

---

[4] The court assumes, without deciding, that Plaintiff's history of poly-substance abuse did or does amount to a disability at the relevant time, *i.e.*, that it substantially limited one or more of her major life activities. *Raytheon*, 540 U.S. at 50 n.4.

14

drugs and either begun or completed a supervised rehabilitation program *are* qualified individuals. 42 U.S.C. § 12114(b). This is known as the "safe harbor" provision. It allows an active user to seek rehabilitation, cease use, and regain ADA protection. *See McDaniel v. Miss. Baptist Med. Ctr.*, 869 F. Supp. 445, 450 (S.D. Miss. 1994) (describing the safe harbor provision). Much of the parties' briefing on summary judgment is devoted to hair-splitting analyses of cases interpreting the "currently engaging" language, with the Hospital arguing Plaintiff was currently engaging while Plaintiff argues she qualified for the safe harbor provision.

The court is not in a position to grant summary judgment on the ADA claim based on application of § 12114(a). First, line-drawing based on timing and duration of treatment offers few meaningful distinctions upon which the court could rest a legal conclusion, and the cases cited by the parties and reviewed by the court are all over the map of how much time must pass after cessation and rehabilitation before one is no longer "currently engaging."[5] Second, and more importantly, the Hospital's

---

[5] *See, e.g., Mauerhan v. Wagner Corp.*, 649 F.3d 1180, 1187 (10th Cir. 2011) (holding that "an individual is currently engaging in the illegal use of drugs if the drug use was sufficiently recent to justify the employer's reasonable belief that the drug abuse remained an ongoing problem" and concluding that, on the record before it, an employee was "currently engaging" within the meaning of § 12114(a) after thirty days of intensive treatment (internal quotations omitted)); *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 856 (5th Cir. 1999) (adopting the same standard for "currently engaging" and holding that an employee was "currently engaging" where employee had used cocaine as much as five times a week for two years but had refrained from drug use for five weeks when he was terminated); *Shafer v. Preston Mem'l Hosp. Corp.*, 107 F.3d 274, 278 (4th Cir. 1997) (holding that "an employee illegally using drugs in a periodic fashion during the weeks and months prior to discharge is 'currently

argument presupposes Plaintiff's illegal use of drugs caused her discharge. Given the differences in explanations for her termination discussed above, even if Plaintiff was "currently engaging in illegal use of drugs," there is a genuine issue of material fact as to whether the Hospital was acting "on the basis of such use." 42 U.S.C. § 12114(a).

### 2. **Post-Diversion Policy**

Identifying a nondiscriminatory justification for its action, the Hospital next argues that even if Plaintiff was a qualified individual, her termination did not result from a disability, but from its generally applicable post-diversion policy.

> It may be a defense to a charge of discrimination . . . that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation . . . .

---

engaging in the illegal use of drugs'" and concluding that nurse who diverted narcotics from hospital supply less than one month before she was fired was "currently using"); *McDaniel*, 869 F. Supp. at 450 (finding that there was a genuine issue of material fact precluding summary judgment where the plaintiff presented evidence he was terminated during the course of inpatient drug treatment or after he completed treatment); *Andriacchi v. City of Chicago*, No. 96-C-4378, 1996 WL 685458, at *3 (N.D. Ill. Nov. 22, 1996) (finding that the current use exclusion did not warrant dismissal of ADA claim, where the plaintiff alleged he was terminated after he had been in drug treatment for approximately four months). This analysis is made more difficult by the parties' failure to identify what time period – between July when Plaintiff's FMLA leave ended and the Hospital refused to allow her to return to the PCU and September when the Hospital terminated her – was "current" for the purposes of applying § 12114(a). Thus, a material factual dispute exists.

16

42 U.S.C. § 12113(a).[6]  Where an employer applies a neutral rule of general applicability in making staffing decisions, a discriminatory animus cannot be said to drive that decision.  *Raytheon Co.*, 540 U.S. at 53.  And a rule may be "neutral" even where the workplace misconduct it prohibits is related to a disability.  *Id.* at 54 n.6.  It appears the Hospital's post-diversion policy is a neutral rule of general applicability.[7]

But, again, the Hospital's argument presupposes the policy is what led to Plaintiff's termination.  As discussed above, Plaintiff has produced substantial evidence to the contrary, and that contrary evidence is sufficient to allow a reasonable jury to find that the Hospital's focus on the post-diversion policy is pretextual.  The Hospital is not entitled to summary judgment on Plaintiff's ADA claim.

---

[6] Specifically, an employer "may hold an employee who engages in the illegal use of drugs or who is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the drug use or alcoholism of such employee." 42 U.S.C. § 12114(c)(4).

[7] Likewise, the Hospital's prohibition on diversion is a neutral rule of general applicability.  (Doc. # 18 at 36 (prohibiting "unauthorized possession, usage, or disposal of drugs," as well as "[u]sing drugs inappropriately while working").)  The irony is not lost on the court that pursuant to Hospital policy, Defendant could have terminated Plaintiff simply for violating that policy – irrespective of whether she was addicted to drugs or ever used them – and that doing so may have prevented this litigation.

## V. CONCLUSION

Accordingly, it is ORDERED that Defendant's Motion for Summary Judgment (Doc. # 16) is GRANTED as to Count I and DENIED as to Counts II and III.

DONE this 23rd day of September, 2013.

                                        /s/ W. Keith Watkins
                           CHIEF UNITED STATES DISTRICT JUDGE